STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Case Type: Personal Injury;
Other Civil

---

**Brad Charles Carlson,**

Plaintiff,

vs.

**Thomas Tichich**, individually, and in his official capacity as a City of Minneapolis Police Officer; **Aaron Collins**, individually and in his official capacity as a City of Minneapolis Police Officer; and the **City of Minneapolis,**

Defendants.

Court File No.: _____
Judge: _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiff Brad Carlson as and for his complaint against the Defendants, Thomas Tichich ("Tichich"), Aaron Collins ("Collins") and the City of Minneapolis, states and alleges as follows:

### PRELIMINARY STATEMENT

1.      On June 1, 2011, City of Minneapolis Police Officers Tichich and Collins took Plaintiff Brad Charles Carlson into custody for the purpose of bringing him to Hennepin County Medical Center ("HCMC") Acute Psychiatric Services ("APS") for evaluation. While Brad Charles Carlson was handcuffed in the sally port at HCMC APS, the officers threw him to the ground, fracturing the humerus bone in his left arm, causing severe and permanent physical injury and great pain.

Exhibit B

2.      Plaintiff Brad Charles Carlson commences this action against Defendants Tichich and Collins, individually and in their official capacities as City of Minneapolis Police Officers, and their employer, the City of Minneapolis, for violations of his rights under the United States Constitution, including his right under the Fourth, Fifth and Fourteenth Amendments to be free from unlawful seizure and excessive force.  Plaintiff's federal claims against the Defendants are grounded in 42 U.S.C. § 1983.

3.      Mr. Carlson demands that this action be tried to a jury.

## PARTIES AND JURISDICTION

4.      Plaintiff Brad Charles Carlson is a resident of the City of Minneapolis, County of Hennepin, and State of Minnesota.

5.      Defendant Thomas Tichich, at all times relevant hereto, was a City of Minneapolis Police Officer and was acting within the course and scope of his employment with the City of Minneapolis.

6.      Defendant Aaron Collins, at all times relevant hereto, was a City of Minneapolis Police Officer and was acting within the course and scope of his employment with the City of Minneapolis.

7.      Defendant City of Minneapolis (the "City") is a municipal corporation organized under the laws of the State of Minnesota.  At all relevant times hereto, the City employed Defendant Tichich and Defendant Collins in the Minneapolis Police Department ("MPD") and was responsible for their supervision, training and discipline.

8.      At all times relevant hereto, Defendants Tichich and Collins were acting under color of law and pursuant to their authority as City of Minneapolis Police Officers.

2

Exhibit B

9.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. This Court has subject matter jurisdiction to hear this claim pursuant to Minn. Stat. § 484.01 subd. 1(1).

## THE FACTS

10.     On June 1, 2011, Brad Charles Carlson was 53 years old. He resided at 2625 7th Street Northeast in Minneapolis, where he had lived since 1978.

11.     On June 1, 2011, Mr. Carlson had full time employment as a shipping clerk at a warehouse. He worked his regular shift from 5:00 a.m. to 1:30 p.m., then returned home to his residence.

12.     While at home that afternoon, Mr. Carlson consumed a few glasses of rum and juice and spent time at his computer visiting websites on the internet.

13.     In the evening, Mr. Carlson observed a neighbor parking his car in front of Mr. Carlson's house. The neighbor had parked in this spot many times before, which troubled Mr. Carlson because the neighbor's car blocked the walkway across the boulevard strip, forcing people to walk on the grass, which Mr. Carlson had newly seeded the summer before. The neighbor was well aware of Mr. Carlson's concerns, because Mr. Carlson had previously spoken to him on more than one occasion.

14.     Mr. Carlson went outside, barefoot. Mr. Carlson has peripheral neuropathy, making it uncomfortable to walk barefoot, and so he was walking slowly and gingerly.

15.     Mr. Carlson asked the neighbor to move his car a few feet forward, so the walkway would be clear. At no time in this conversation did Mr. Carlson use profanity or threatening speech of any kind.

3

Exhibit B

16.     The neighbor ignored Mr. Carlson and did not speak to him.   However, the neighbor's wife began yelling at Mr. Carlson.   Moments later, another neighbor, Tony Brown, came outside. Mr. Carlson had a history of disputes with the Browns, who had previously called the police to complain about him.   While standing in the street, Mr. Carlson said to Mr. Brown, "Tony, come on down and talk. I know what you do."   At no time in this conversation did Mr. Carlson use profanity or threatening speech of any kind, nor did Mr. Carlson approach the Browns or set foot on their property.   Nonetheless, at this point Mr. Brown's wife, Candice Brown, emerged from their house with a phone in hand, and said she had the police on the line. Mr. Carlson immediately returned to his home, intending to call the police himself.

17.     At 7:36:30 p.m., one of Mr. Carlson's neighbors placed a 911 call.   The caller began the call by stating, "this is not an emergency." *Exhibit 1*.   The caller described two neighbors on the block, a white man in his thirties and a white man about age fifty, who had been engaged in a verbal dispute in the street. *Id*.   The caller described the man in his thirties as wearing a white T-shirt, and the fifty-year-old man "just had black shorts on, no shirt." *Id.*   The caller observed that the man in the white T-shirt had "gone back in his house," and that the caller was "not hearing anything right now." *Id.*   When asked whether police still needed to come out there, the caller responded, "no."   The dispatcher confirmed, "Okay.   All right.   We'll cancel that." *Id.*

18.     At 7:36:48 p.m., a second 911 call was placed, upon information and belief, by Candice Brown.   The caller reported, "I got a guy out in the middle of – yeah, a guy out in the middle of the street, harassing me." *Exhibit 2*.     The caller, believed to be Mrs. Brown, identified the man as Brad Carlson, stating, "I was just standing out there. I heard somebody yell, and I come out to look. And all of a sudden he starts harassing me and starts yelling at me,

4

saying F you, F this, I'm going to go and take care of you, F you, F this[.]" *Id.* The caller, believed to be Mrs. Brown, identified Brad Carlson as a white male, and observed, "He has no shirt on right now. He's got a pair of shorts and that's it." When the dispatcher inquired, "And what's his problem, do you know?" the caller, believed to be Mrs. Brown, opined that "he is bipolar, I bet you, I think. So, uh, he probably is not on his drugs, who knows, but he's had issues before." *Id.* The dispatcher asked, "Is he hurting anyone?" and the caller, believed to be Mrs. Brown, responded, "he's just verbally attacking right now. He's threatening. . . . Verbally aggressively threatening." The dispatcher stated, "Okay. We'll get somebody over there."

19.    At 7:40:37 p.m., Mr. Carlson called 911. He reported that his neighbor Tony Brown "is a CIA operative that is selling drugs throughout my neighborhood. That's all I got to say." *Exhibit 3.*

20.    According to the police reports (*Exhibit 4*), while in their squad car, Officers Collins and Tichich reviewed a summary of the 911 calls. The dispatcher noted that one caller had canceled the call "because both parties were in their respective houses," but asked the officers to "check on the welfare of this caller because of the seemingly irrational comments he made" in his 911 call. *Exhibit 4.*

21.    According to the police reports, Officers Collins and Tichich pulled up in front of Mr. Carlson's house at about 7:59 p.m. *Exhibit 4.* Mr. Carlson emerged from his home and walked to meet them at the chain-link fence surrounding his front yard, about ten feet from the gate. Mr. Carlson was still barefoot and shirtless, wearing only a pair of shorts.

22.    According to the police reports, Mr. Carlson spoke with Officers Collins and Tichich across the fence for several minutes, during which time Mr. Carlson shared the history of his disputes with the Browns, including his view that Mr. Brown was a CIA operative engaged in

5

Exhibit B

a conspiracy to sell drugs in the neighborhood. When he saw Mr. Brown during this conversation, he called out his name. Mr. Brown did not respond.

23. According to the police reports, during this conversation Officers Collins and Tichich concluded that Mr. Carlson was intoxicated and irrational. They decided to take Mr. Carlson into custody for the purpose of transporting him to HCMC for psychiatric evaluation. At no point did the officers ask Mr. Carlson if he would go to HCMC voluntarily.

24. From the police reports, Officers Collins and Tichich opened the gate to Mr. Carlson's front yard, at which point Mr. Carlson headed back toward his front door. The officers tackled Mr. Carlson on his doorstep. Officer Collins placed Mr. Carlson's right hand behind his back and Officer Tichich handcuffed Mr. Carlson. Having handcuffed Mr. Carlson behind his back, Officers Collins and Tichich walked him to the squad car and placed him in the rear seat.

25. From the police reports, Officer Collins entered Mr. Carlson's home, located his house keys, and locked the door. Meanwhile, Officer Tichich spoke with some of Mr. Carlson's neighbors, who complained about Mr. Carlson's behavior.

26. According to the police reports when Officer Collins returned to the squad car, Mr. Carlson asked Officer Collins why he was being arrested. Officer Collins explained that he was not being arrested. Mr. Carlson asked "approx ten times" why he was being arrested, and each time Officer Collins said he was not being arrested. *Exhibit 4.*

27. Mr. Carlson told Officer Collins, "You're going to make me lose my job," and Officer Collins responded, "Good, we want you to lose your job." Mr. Carlson also told Officer Collins, "You're a bunch of Satanists." Officer Collins responded, "Yes, we are."

Exhibit B

28.     According to the police reports, Mr. Carlson told Officer Collins that he "should have fought you guys before you handcuffed me." Mr. Carlson also threatened to sue Officer Collins and asked if Officer Collins was Satan. Officer Collins ignored him. *Exhibit 4.*

29.     According to the police reports, Officer Tichich returned to the squad car and the officers drove Mr. Carlson to HCMC. En route, the officers attempted to obtain personal information from Mr. Carlson. Mr. Carlson refused to provide the information and called the officers names. Mr. Carlson also suggested that the officers "drive him to the north side, unhandcuff him and fight him" and either let him go if he won, or take him to jail if he lost. *Exhibit 4.* Mr. Carlson intended this last statement as a joke, and Officers Collins and Tichich laughed when he said it.

30.     From the police report, upon arrival at HCMC, the officers parked near the entrance to APS, and opened the rear squad car door to allow Mr. Carlson to get out. Mr. Carlson did so, still handcuffed behind his back, barefoot, and wearing nothing but a pair of shorts. Officer Tichich grabbed Mr. Carlson's right arm, and Officer Collins grabbed Mr. Carlson's left arm.

31.     Upon information and belief, while holding Mr. Carlson's arm on the walk from the squad car to the sally port door, Officer Tichich squeezed "pressure points" on Mr. Carlson's arm where the nerves were particularly sensitive. From the police reports, the pressure was very painful, causing Mr. Carlson to turn toward Officer Tichich and cry out, "don't manhandle me" or "stop manhandling me." Officer Tichich continued to apply pressure, causing Mr. Carlson to again cry out not to "manhandle" him. *Exhibit 4.*

32.     The outer door of the sally port opened and Mr. Carlson stepped through, accompanied by Officers Collins and Tichich. Mr. Carlson, still handcuffed behind his back,

Exhibit B

turned toward Officer Tichich in an effort to relieve the pressure of Officer Tichich's grip, again crying, "stop manhandling me!" *Exhibit 4.*

33.    From the police report, immediately upon entering the sally port Officer Collins executed a "takedown" of Mr. Carlson. *Exhibit 4.* Officer Collins shoved his right arm through Mr. Carlson's left handcuffed arm, swung his left arm to Mr. Carlson's chest, and using his right foot, knocked Mr. Carlson's left foot out from under him, so that Mr. Carlson slammed backward to the floor with his arms still pinned behind his back.

34.    As a direct result being taken down by Officer Collins while handcuffed, Mr. Carlson fell on his upper left arm, severely fracturing the humerus bone.

35.    While Mr. Carlson lay on the floor of the sally port, still handcuffed behind his back and wearing only a pair of shorts, Officer Collins pressed four fingers on the side of Mr. Carlson's jaw. *Exhibit 4.*

36.    Upon information and belief, while Mr. Carlson lay on the floor of the sally port, Officer Collins applied pressure to a "pressure point" on Mr. Carlson's neck, causing intense pain and causing Mr. Carlson's feet to twitch.

37.    Soon afterward, the inner door of the sally port opened, and HCMC nurse Yolanda Renee Lissimore entered the sally port. Nurse Lissimore heard Mr. Carlson say to the officers, "You're hurting me, why are you using pressure points on me?" *Exhibit 4.*

38.    HCMC security then arrived with a gurney to transport Mr. Carlson into the hospital. They grabbed Mr. Carlson by both arms, including his broken left arm, hauled him up onto the gurney, and wheeled him into the hospital for examination.

39.    Mr. Carlson was immediately taken to have an x-ray, which confirmed that he had suffered a severe fracture of the humerus bone in his left arm.

Exhibit B

40.     Mr. Carlson was held at HCMC for six days.

41.     Mr. Carlson called in to his job before his shift on June 2 and June 3, 2011. On the second call, Mr. Carlson advised that he was not sure how much longer he would be held.

42.     When Mr. Carlson was released from HCMC, nearly a week after he was taken into custody, he discovered that he had lost his job.

43.     As a direct result of the Defendants' conduct, Mr. Carlson was seriously and permanently injured. As a direct result of the Defendants' conduct, Mr. Carlson has suffered pecuniary loss, including but not limited to lost wages and medical expenses.

44.     Mr. Carlson was never charged with any crime in connection with the events of June 1, 2011.

45.     Mr. Carlson was never involuntarily civilly committed in connection with the events of June 1, 2011.

46.     On August 23, 2011, Mr. Carlson filed a complaint with the Minneapolis Civilian Police Review Authority ("CPRA") alleging that Officers Collins and Tichich used excessive force. The CPRA investigated Mr. Carlson's allegations and determined by a preponderance of the evidence that Officers Collins and Tichich used excessive force against Mr. Carlson. The CPRA sustained Mr. Carlson's complaint and sent the complaint file to the MPD Chief for final determination and disciplinary action. *Exhibit 5.*

47.     On information and belief, the Internal Affairs Unit of the Minneapolis Police Department investigated the incident for possible misconduct by the individual defendant police officers and for possible violations of the Minneapolis Police Department's rules, regulations procedures and policies by the individual defendant police officers. On information and belief, after conducting its own investigation of the incident the internal affairs unit

Exhibit B

concluded that the level of force used by the individual defendant police officers on Mr. Carlson was not necessary – so it was unjustified and excessive.

48.    On October 21, 2011, Mr. Carlson filed a pro se civil complaint against the City in Hennepin County, State of Minnesota.  That action has been voluntarily dismissed without prejudice.

## COUNT I

### Violations of the Fourth, Fifth, and Fourteenth Amendments
### and 42 U.S.C. §1983

49.    Plaintiff realleges all of the above allegations set forth in this complaint as if hereinafter set forth in full, and the Plaintiff further states and alleges as follows:

50.    This claim arises under Title 42 of the United States Code (Civil Rights Act of 1871, as amended), including but not limited to §1983.

51.    The Defendants acted alone and/or in concert (two or more in concert) and they were state actors.

52.    Defendants deprived the Plaintiff of his rights, privileges and immunities secured by the United States Constitution; specifically, the Fourth, Fifth and Fourteenth Amendments in conjunction with other rights, including but not limited to, the following established rights: (a) the right to be free from unreasonable searches and seizures; (b) the right not to be deprived of liberty without due process of law; (c) the right to be free from excessive use of force by persons acting under color of state law; and (d) the right to be free from false arrest.

53.    Plaintiff was subjected to unreasonable seizure when he was taken into custody on his doorstep as he was trying to enter his home.  There was no justification for seizing Plaintiff and therefore it was unreasonable.

10

Exhibit B

54.    Plaintiff was subjected to unreasonable and excessive force when he was thrown to the floor while handcuffed inside the sally port of HCMC – APS, resulting in a fractured humerus bone and severe and permanent physical injury.  There was no justification for this use of force and therefore it was unreasonable and excessive.

55.    The conduct and force used by the Defendants against the Plaintiff was unreasonable in light of the then existing facts and circumstances as judged by a reasonable police officer at the scene on June 1, 2011.

56.    Defendants' individual and joint conduct was objectively unreasonable, and the unlawfulness of their actions or omissions was apparent in light of clearly established law.

57.    As a direct and proximate result of the violation of the Plaintiffs' constitutional rights by the Defendants, Plaintiff suffered damages as alleged in this complaint, and Plaintiff is entitled to relief under 42 U.S.C. §1983. For all of the reasons set forth above, Plaintiffs is entitled to a judgment against the Defendants, jointly and severally, in a reasonable amount in excess of $50,000.  The City is liable under the doctrine of respondeat superior.

## COUNT II
### Punitive Damages under Federal Law

58.    Plaintiff realleges the above allegations as if hereinafter set forth in full and further states and alleges as follows:

59.    All of the aforementioned acts, errors and omissions of Defendants Collins and Tichich were willful and malicious, committed in bad faith and with reckless disregard for the rights and safety of Plaintiff and other citizens, so as to subject the Defendants to punitive damages pursuant to the statutes and common law of the United States of America.

Exhibit B

## COUNT III
## Municipal Liability

60. Plaintiff realleges the above allegations as if hereinafter set forth in full and further states and alleges as follows:

61. Prior to June 1, 2011, the City of Minneapolis developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of persons in Minneapolis, which caused the above-described violations of Plaintiff's civil rights.

62. It was the policy and/or custom and practice of the City as of June 1, 2011, to inadequately and improperly train police officers, including the individual Defendants, regarding the use of force to take a citizen into custody for the purpose of psychiatric evaluation.

63. It was the policy and/or custom and practice of the City as of June 1, 2011, to inadequately supervise, train, or discipline police officers, including the individual Defendants, with regard to the use of force to take a citizen into custody for the purpose of psychiatric evaluation.

64. As a direct result of the above described policies, customs, and practices of the City, Minneapolis police officers, including the individual Defendants, acted under the belief that their use of unreasonable force would not be adequately supervised by their superiors and that such misconduct would not be investigated or sanctioned, but would be tolerated.

65. Such policies, customs, and practices amount to a deliberate indifference on the part of the City to the constitutional rights of persons within Minneapolis, and were the direct cause of the violations of Plaintiff's rights alleged herein.

Exhibit B

## COUNT IV
### Assault

66.     Plaintiff realleges the above allegations as if hereinafter set forth in full and further states and alleges as follows:

67.     When Defendants Collins and Tichich pursued Mr. Carlson in his front yard they created a reasonable apprehension of an immediate battery.

68.     The aforesaid conduct by Defendants Collins and Tichich was done intentionally by Defendants Collins and Tichich.

69.     The aforesaid conduct by Defendants Collins and Tichich constitutes assault.

70.     The aforesaid conduct by Defendants Collins and Tichich caused severe and permanent physical injury to Plaintiff.

71.     As a direct result, Plaintiff has suffered pecuniary loss, including but not limited to medical expenses and lost wages.

72.     For the reasons set for above, Plaintiff is entitled to judgment against Defendants Collins and Tichich, both jointly and severally, in a reasonable amount in excess of $50,000.

## COUNT V
### Battery

73.     Plaintiff realleges the above allegations as if hereinafter set forth in full and further states and alleges as follows:

74.     Defendants Collins and Tichich intentionally and without permission had offensive, harmful contact with the Plaintiff, Brad Charles Carlson.

75.     The aforesaid conduct was done intentionally by Defendants Collins and Tichich.

76.     The aforesaid conduct by Defendants Collins and Tichich constitutes battery.

Exhibit B

77.     The aforesaid conduct by Defendants Collins and Tichich caused severe and permanent physical injury to Plaintiff.

78.     As a direct result, Plaintiff has suffered pecuniary loss, including but not limited to medical expenses and lost wages.

79.     For the reasons set forth above, Plaintiff is entitled to judgment against Defendants Collins and Tichich, both jointly and severally, in a reasonable amount in excess of $50,000.

## COUNT VI
### Vicarious Liability

80.     Plaintiff realleges the above allegations as if hereinafter set forth in full and further states and alleges as follows:

81.     Defendant City of Minneapolis, as an employer, is vicariously liable for the state law torts of its employees, Defendants Collins and Tichich, as described above.

82.     As a result of this culpable conduct, these torts committed by employees of the City of Minneapolis while they were acting within the course and scope of their duties as City of Minneapolis Police Officers, Plaintiff was injured and incurred damages as set forth above.

**WHEREFORE**, Plaintiff respectfully prays that this Court grant them relief as follows:

1.     Awarding judgment in favor of Plaintiff and against Defendants and each of each of them jointly and severally in an amount greater than $50,000 in compensatory damages.

2.     Awarding judgment in favor of Plaintiff and against Defendants Collins and Tichich, individually, in an amount greater than $50,000 as and for punitive damages pursuant to 42 U.S.C. § 1983.

3.     Awarding Plaintiff his reasonable attorney's fees, pursuant to 42 U.S.C. § 1988.

Exhibit B

4.   Awarding Plaintiff his costs and disbursements incurred herein.

5.   For such other and further relief as to the Court deems just and equitable.

Exhibit B

Dated: July 30, 2012

James R. Behrenbrinker (MN#186739)
*Attorney at Law*
Suite 202 - Minneapolis Grain Exchange
400 South Fourth Street
Minneapolis, MN 55415-1413
Tel.: 612.294.2605 (voice)
Fax: 612.284.181971 and 612.294.2640
Cell: 612.419.8400
JBehrenbrinker@comcast.net

Karin Ciano (MN # 0343109)
Karin Ciano Law PLLC
2915 Wayzata Boulevard
Minneapolis, MN 55405
Tel. : 612-367-7135
Fax.: 612-437-4440
Karin@karincianolaw.com

**Attorneys for Plaintiff**
**Brad Charles Carlson**

## ACKNOWLEDGEMENT REQUIRED BY LAW

Plaintiff, through his undersigned attorneys, hereby acknowledges that costs, disbursements, and reasonable attorney and witness fees may be awarded pursuant to Minn. Stat. § 549.211, to the party against whom the allegations in this pleading are asserted.

Dated: July 30 2012

James R. Behrenbrinker

Karin Ciano

16

Exhibit B

# [EXHIBIT 1]



STATE OF MINNESOTA                          DISTRICT COURT

COUNTY OF HENNEPIN            FOURTH JUDICIAL DISTRICT

- - - - - - - - - - - - - - - - - - - - - - - - -

Brad Charles Carlson,

                Plaintiff,

    vs.

City of Minneapolis,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF RECORDED

911 CALL FROM ▮▮▮▮▮

- - - - - - - - - - - - - - - - - - - - - - - - -

Conducted by

Minneapolis Police Dispatch

06-01-11 07-36-30p Womack III, Oscar (111314)

KIRBY A. KENNEDY & ASSOCIATES
(952) 922-1955

Exhibit B

2

1                   RECORDING:   7:36 p.m., 30 seconds, June 1,

2    2011.

3                DISPATCH:  Minneapolis 911.

4              █████████  Yes, um, this is not an emergency.

5                DISPATCH:  Okay.

6              █████████  But I would like to report a

7    domestic, um, something, yelling.

8                DISPATCH:  Who's doing that?  Where's

9    this, um, at?

10              █████████  Uh, right outside of 2633 7th

11    Street Northeast.

12               DISPATCH:  In front of 2633 7th Street

13    Northeast.  How many people are yelling?

14              █████████  Uh, two men, white.

15               DISPATCH:  (Unintelligible).  All right.

16    Two white males are involved in the verbal argument?

17              █████████  Yes.  Um, my neighbor across the

18    street and then my neighbor a couple houses down are

19    yelling at each other out in the --

20               DISPATCH:  How old are they?

21              █████████  Uh, probably about a 50-year-old

22    male and maybe like a thir -- mid-30s male.

23               DISPATCH:  They're neighbors?

24              █████████  Um, yes, yes.  The one neighbor is

25    across the street from me, and the other neighbor is about,

Exhibit B

1    mm, two -- two or three houses down on the --

2              DISPATCH:  Okay.  We got police out there.

3              ███████:  Okay.  Thank you.

4              DISPATCH:  And what's your name?

5              ███████:  Uh, my name's, uh, ██████.

6              DISPATCH:  What address you calling from?

7              ███████:  I'm at ██████  So██████is not

8    involved.

9              DISPATCH:  Okay.  And --

10             ███████:  I'm -- It's just the general area

11   of what's going on right now.

12             DISPATCH:  Okay.  You're calling from

13   ████████████

14             ███████:  Yep.

15             DISPATCH:  The one that's 30 years old,

16   what is he wearing?

17             ███████:  Um, well, now he's gone back in his

18   house.  He had a white -- white T-shirt on.

19             DISPATCH:  How did -- How about the second

20   guy, what was he wearing?

21             ███████:  Uh, he just had black shorts on, no

22   shirt.

23             DISPATCH:  Okay.  Do police still need to

24   come out there or -- or --

25             ███████:  Uh, it does not -- It had been

Exhibit B

4

1    going on for about ten minutes or so, so that's why I

2    called, but I'm not hearing anything right now.

3                    DISPATCH:  Okay.  Do you want police to

4    come out there still or --

5                    ███████:  Um --

6            DISPATCH:  I mean, we can.

7                    ███████:  -- no.

8            DISPATCH:  Okay.  All right.  We'll cancel

9    that.

10                   ███████:  No.  Okay.

11           DISPATCH:  All right.  Bye.

12                   ███████:  Thank you.  Bye.

13           (End of call.)

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit B

5

```
1    STATE OF MINNESOTA      )
                             )
2    COUNTY OF STEARNS       )

3

4                    REPORTER'S CERTIFICATE

5

6          I, Judy M. Fugate, Registered Merit Reporter,

7    do hereby certify that the above and foregoing transcript,

8    taken off of digital recording, is a correct transcript of

9    my stenographic notes and is a full, true and complete

10   transcription of the proceedings to the best of my ability.

11

12

13                    Dated   April 12, 2012

14

                              /s/
15                            JUDY M. FUGATE, RMR
                              Court Reporter
16

17

18

19

20

21

22

23

24

25
```

KIRBY A. KENNEDY & ASSOCIATES
(952) 922-1955

Exhibit B

# [EXHIBIT 2]

1

2 STATE OF MINNESOTA                    DISTRICT COURT

3 COUNTY OF HENNEPIN            FOURTH JUDICIAL DISTRICT

4 - - - - - - - - - - - - - - - - - - - - - - - - - -

5 Brad Charles Carlson,

6                      Plaintiff,

7      vs.

8

9 City of Minneapolis,

10                     Defendant.

11 - - - - - - - - - - - - - - - - - - - - - - - - - -

12

13              TRANSCRIPT OF RECORDED

14              911 CALL FROM ██████████

15 - - - - - - - - - - - - - - - - - - - - - - - - - -

16

17                    Conducted by

18             Minneapolis Police Dispatch

19      06-01-11 07-36-48p Mortek, Avalon (65649)

20

21

22

23

24

25

KIRBY A. KENNEDY & ASSOCIATES
(952) 922-1955

Exhibit B

1    RECORDING:  7:36 p.m., 48 seconds, June 1,

2    2011.

3    DISPATCH:  Minneapolis Police and Fire.

4    ████████  Yeah, I got a guy out in the

5    middle of -- yeah, a guy out in the middle of the street,

6    harassing me.

7    DISPATCH:  What address you at?

8    ████████:  Uh, ████ 7th Street

9    Northeast.

10   DISPATCH:  Who is this man?  Do you know

11   him?  I can hear him.  He's -- He's ver -- a rather

12   pleasant chap, huh?  What's he look like --

13   ████████  Yeah.

14   DISPATCH:  -- white man, black man,

15   Hispanic man?

16   ████████:  Uh, he is, I think, Brad

17   Carlson.  I was just standing out there.  I heard somebody

18   yell, and I come out to look.  And all of a sudden he

19   starts harassing me and starts yelling at me, saying F you,

20   F this, I'm going to go and take care of you, F you, F this

21   and --

22   DISPATCH:  Oh, yeah, looks like another

23   person's called as well, uh.  What's -- Brad Carlson, is he

24   a white male?

25   ████████  He's a white male.  He's --

Exhibit B

1  He has no shirt on right now.  He's got a pair of shorts

2  and that's it.

3  　　　　　　　　DISPATCH:  And what's his problem, do you

4  know?

5  　　　　　　██████████:  Uh, he is bipolar, I bet you,

6  I think.  So, uh, he probably is not on his drugs, who

7  knows, but he's had issues before.

8  　　　　　　　　DISPATCH:  Okay.  Do you know what address

9  he lives at?  Does he live on the block?

10 　　　　　　██████████:  He lives on -- across the

11 street from me.

12 　　　　　　　　DISPATCH:  And you're at ████7th; right?

13 　　　　　　██████████:  And two (unintelligible).

14 　　　　　　　　DISPATCH:  Okay.  Across the street and

15 what?

16 　　　　　　██████████:  About two houses down.  Uh,

17 2625 it looks like, 7th.

18 　　　　　　　　DISPATCH:  Okay.  And what is your name,

19 sir?

20 　　　██████████  ██████████.  I just came out

21 to see what was going on.  I just --

22 　　　　　　　　DISPATCH:  I -- I understand.  And what's

23 your phone number, please?

24 　　　　　　██████████:  (Unintelligible) like that.

25 I didn't -- Huh?

KIRBY A. KENNEDY & ASSOCIATES
(952) 922-1955

Exhibit B

4

1          DISPATCH:  Your phone number, please?

2          ████████  :  Uh,  ████████████

3          DISPATCH:  Is he hurting anyone?

4          ████████  :  Uh, he's just verbally

5     attacking right now.  He's threatening.

6          DISPATCH:  Okay.

7          ████████  :  Verbally aggressively

8     threatening.

9          DISPATCH:  Okay.  We'll get somebody over

10    there.

11         ████████  Thank you.

12         DISPATCH:  Uh-huh.  Bye.

13         (End of call.)

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit B

5

```
1    STATE OF MINNESOTA    )
                           )
2    COUNTY OF STEARNS     )

3

4                    REPORTER'S CERTIFICATE

5

6            I, Judy M. Fugate, Registered Merit Reporter,

7    do hereby certify that the above and foregoing transcript,

8    taken off of digital recording, is a correct transcript of

9    my stenographic notes and is a full, true and complete

10   transcription of the proceedings to the best of my ability.

11

12

13                   Dated   April 12, 2012

14

15                           /s/
                             JUDY M. FUGATE, RMR
16                           Court Reporter

17

18

19

20

21

22

23

24

25
```

KIRBY A. KENNEDY & ASSOCIATES
(952) 922-1955

Exhibit B

# [EXHIBIT 3]



1

2   STATE OF MINNESOTA             DISTRICT COURT

3   COUNTY OF HENNEPIN       FOURTH JUDICIAL DISTRICT

4   - - - - - - - - - - - - - - - - - - - - - - - - - -

5   Brad Charles Carlson,

6                Plaintiff,

7      vs.

8

9   City of Minneapolis,

10               Defendant.

11  - - - - - - - - - - - - - - - - - - - - - - - - - -

12           TRANSCRIPT OF RECORDED

13        911 CALL FROM BRAD CARLSON

14

15  - - - - - - - - - - - - - - - - - - - - - - - - - -

16

17             Conducted by

18       Minneapolis Police Dispatch

19   06-01-11 07-36-30p Womack III, Oscar (111314)

20

21

22

23

24

25

KIRBY A. KENNEDY & ASSOCIATES
(952) 922-1955

Exhibit B

2

1                 RECORDING:  7:40 p.m., 37 seconds, June 1,

2   2011.

3                 BRAD CARLSON:  Hi.  My name is Brad

4   Carlson, 2625 7th Street Northeast, Minneapolis, Minnesota

5   55418.

6                 DISPATCH:  Mm-hm.

7                 BRAD CARLSON:  I'm here to report that

8   Tony Brown, at 2626 7th Street Northeast, Minneapolis,

9   Minnesota 55418, is a CI operative and is selling drugs

10  throughout my neighborhood.

11                DISPATCH:  2626, that's Tony Brown?

12                BRAD CARLSON:  Tony Brown.  He's a CIA

13  operative that is selling drugs throughout my neighborhood.

14  That's all I got to say.

15                DISPATCH:  CIA operative?

16                BRAD CARLSON:  A CIA operative.  That's a

17  fact, Jack.  And, uh, that's all I need to say.

18                DISPATCH:  Who was he selling the drugs

19  to?

20                BRAD CARLSON:  What's that?

21                DISPATCH:  Who's he selling the drugs to?

22                BRAD CARLSON:  Speak clearly, please.

23                DISPATCH:  Who was he selling the drugs

24  to?

25                BRAD CARLSON:  He's a CI operative.

Exhibit B

3

1                  DISPATCH:  That doesn't mean anything.

2  Who was he selling them to?

3                  BRAD CARLSON:  Hey, hey, hey, hey, uh,

4  that's all I got to say.

5                  DISPATCH:  Who was he selling them to?

6                  BRAD CARLSON:  Tha -- That's all -- That's

7  all I got to say.

8                  RECORDING:  Hello.

9             (End of call.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit B

4

```
 1   STATE OF MINNESOTA    )
                           )
 2   COUNTY OF STEARNS     )

 3

 4                    REPORTER'S CERTIFICATE

 5

 6           I, Judy M. Fugate, Registered Merit Reporter,

 7   do hereby certify that the above and foregoing transcript,

 8   taken off of digital recording, is a correct transcript of

 9   my stenographic notes and is a full, true and complete

10   transcription of the proceedings to the best of my ability.

11

12

13                    Dated  April 12, 2012

14

15                           /s/
                             JUDY M. FUGATE, RMR
16                           Court Reporter

17

18

19

20

21

22

23

24

25
```

KIRBY A. KENNEDY & ASSOCIATES
(952) 922-1955

Exhibit B

# [EXHIBIT 4]

MPD CAPRS Public Information Report - MP-11-155282

| **Public Information Report** | **Minneapolis Police Department** | **CCN: MP-11-155282** |
|---|---|---|

## Report Details

| | | | |
|---|---|---|---|
| Reported Date: | Jun 1, 2011 23:10 | Reporting Officer: | 007235: Thomas Tichich |
| Last Uploaded: | Jun 3, 2011 | Date Printed: | Jun 22, 2011 |
| Related CCN : | — | | |
| Precinct: | 02 | | |

## Incident Details

| | | | | |
|---|---|---|---|---|
| Offense1: CIC | Desc: Crisis Intervention | Statute: | 253B.05.2 | Attempted: |
| Offense2: FORCE | Desc: Use Of Force | Statute: | | Attempted: |
| Address: | 2625 7 ST NE MINNEAPOLIS, MN 55418 | | | |
| Occurred From: | 06/01/2011 19:40 | Occurred To: | 06/01/2011 20:30 | |

## Public Data

Officers transported OT1 to HCMC CIC and placed a 72 hour hold on him.

## Witness

| | | | |
|---|---|---|---|
| Role / Role #: | W001 | | |
| Name: | Lissimore, Yolanda Renee | | |
| Residence: | 701 Park AV S Minneapolis, MN | | |
| Telephone: | O:612-873-9300 | | |
| Date of Birth: | 08/02/1965 | Event Age: 45 | Est. Age: 45 - 45 |
| Race: | Black | Medical Treatment: | No |
| Sex: | Female | Prior Injury: | No |
| Height: | | | |
| Build: | | | |

*(handwritten: Nurse @ HCMC)*

### Personal Description

| Category | Description | Related Offense | Comments |
|---|---|---|---|
| Force Used | No | | |

## Other

| | | | |
|---|---|---|---|
| Role / Role #: | OT001 | | |
| Name: | Carlson, Brad Charles | | |
| Residence: | 2625 7 ST NE MINNEAPOLIS, MN 55418 | | |
| Telephone: | R:unk | | |
| Date of Birth: | 05/19/1958 | Event Age: 53 | Est. Age: 53 - 53 |
| Race: | White | Medical Treatment: | Yes |
| Sex: | Male | Prior Injury: | No |
| Height: | | | |
| Build: | | | |

### Personal Description

| Category | Description | Related Offense | Comments |
|---|---|---|---|

6/22/2011

Exhibit B

MPD CAPRS Public Information Report - MP-11-155282

| Force Used | Yes |
|---|---|

## Other

| | |
|---|---|
| Role / Role #: | OT002 |
| Name: | Kapphann, Jennifer Ellen |
| Residence: | |
| Telephone: | |
| Date of Birth: | 09/05/1979 |
| Race: | White |
| Sex: | Female |
| Height: | |
| Build: | |

Event Age: 31    Est. Age: 31 - 31

## Other

| | |
|---|---|
| Role / Role #: | OT003 |
| Name: | Brown, Candice Marie |
| Residence: | |
| Telephone: | |
| Date of Birth: | 06/12/1972 |
| Race: | White |
| Sex: | Female |
| Height: | |
| Build: | |

Event Age: 38    Est. Age: 38 - 38

## Other

| | |
|---|---|
| Role / Role #: | OT004 |
| Name: | Brown, Tony Jay |
| Residence: | |
| Telephone: | |
| Date of Birth: | 06/12/1972 |
| Race: | White |
| Sex: | Female |
| Height: | |
| Build: | |

Event Age: 38    Est. Age: 38 - 38

## Other

| | |
|---|---|
| Role / Role #: | OT005 |
| Name: | Stack, Andrew |
| Residence: | 701 Park AV S |
| | Minneapolis, MN |
| Telephone: | O:512-873-3887 |
| Date of Birth: | |
| Race: | |
| Sex: | |
| Height: | |
| Build: | |

Event Age: 0    Est. Age: 0

## Other

| | |
|---|---|
| Role / Role #: | OT006 |

Exhibit B

6/22/2011

MPD CAPRS Public Information Report - MP-11-155282

| | |
|---|---|
| Name: | Setter, Dawn |
| Residence: | 701 Park AV S |
| | Minneapolis, MN |
| Telephone: | O:612-873-3132 |
| Date of Birth: | Event Age: 0   Est. Age: 0 |
| Race: | |
| Sex: | |
| Height: | |
| Build: | |

## Other

| | |
|---|---|
| Role / Role #: | OT007 |
| Name: | Baumann, William Peter |
| Residence: | |
| Telephone: | |
| Date of Birth: | 07/26/1956   Event Age: 54   Est. Age: 54 - 54 |
| Race: | White |
| Sex: | Male |
| Height: | |
| Build: | |

**End of report for case MP-11-155282. Print ID: af9860eb-61f5-4cce-91ad-2f43362aec0d**

Exhibit B

| Case Report with Supplements | Minneapolis Police Department | CCN: MP-11-155282 |
|---|---|---|

## Report Details

| | | | |
|---|---|---|---|
| Reporting Officer: | 007235: Thomas Tichich | Approval Status: | Approved |
| Assisting Officer: | 001259: Aaron Collins | Approval Date: | Jun 2, 2011 |
| Supervising Officer: | 002879: Eric Heil | Date Returned: | |
| Approving Supervisor: | 002879: Eric G Heil | Return Count: | 0 |
| Call/Sqd: | 264 | Date Printed: | Jun 29, 2011 |
| Precinct: | 02 | Last Uploaded: | Jun 3, 2011 |
| Related CCN : | -- | Solvability: | |
| Reported Date: | Jun 1, 2011 23:10 | Primary Routed Unit: | 4015 - Business Technology Unit |
| Entered By: | 007235 | | |

## Incident Details

| | | | |
|---|---|---|---|
| Offense1: CIC | Desc: Crisis Intervention | Statute:   253B.05.2 | Attempted: |
| Offense2: FORCE | Desc: Use Of Force | Statute: | Attempted: |
| Address: | 2625 7 ST NE | | |
| | MINNEAPOLIS, MN 55418 | Dispatched: | 19:57:00 |
| Occurred From: | 06/01/2011 19:40 | Arrived: | 19:59:00 |
| Occurred To: | 06/01/2011 20:30 | Cleared: | 01:00:00 |
| Location: | 26 AV NE/27 AV NE | | |
| Minor Involved: | No | | |

## Public Data

Officers transported OT1 to HCMC CIC and placed a 72 hour hold on him.

Exhibit B

MPD CAPRS Case Report With Supplements - MP-11-155282

## Witness

Role / Role #:          W001
Name:                   Lissimore, Yolanda Renee
Residence:              701 Park AV S
                        Minneapolis, MN
Telephone:              C:612-873-9300
Drv Lic #:              MN C913070328013        Event Age: 45           Est. Age: 45 - 45
Date of Birth:          08/02/1965              Medical Treatment:      No
Race:                   Black                   Prior Injury:           No
Sex:                    Female
Height:                 503
Build:

### Employment Information

| Employer/School | Address | Telephone | Occupation |
|---|---|---|---|
| Home | | | Nurse Rn |
| Availability: | | | |

### Personal Description

| Category | Description | Related Offense | Comments |
|---|---|---|---|
| Employment Status | Employed | | |
| Force Used | No | | |

## Other

Role / Role #:          OT001
Name:                   Carlson, Brad Charles
Residence:              2625 7 ST NE
                        MINNEAPOLIS, MN 55418
Telephone:              R:unk
Date of Birth:          05/19/1958              Event Age: 53           Est. Age: 53 - 53
Race:                   White                   Medical Treatment:      Yes
Sex:                    Male                    Prior Injury:           No
Height:                 604
Build:                  ST

### Personal Description

| Category | Description | Related Offense | Comments |
|---|---|---|---|
| Appearance | Disturbed | | |
| Appearance | Mad/Angry | | |
| Appearance | Drunk | | |
| Appearance | Uncooperative | | |
| Complexion | Light | | |
| Employment Status | Unknown | | |
| Eye Color | Hazel | | |
| Force Used | Yes | | |
| Hair Color | Brown | | |
| Hair Length | Short | | |
| Hair Style | Straight | | |
| Type of Resistance Encountered | Tensed | | |

Exhibit B

MPD CAPRS Case Report With Supplements - MP-11-155282

## Other

| | |
|---|---|
| Role / Role #: | OT002 |
| Name: | |
| Residence: | 2624 7 ST NE<br>Minneapolis, MN 55413 |
| Telephone: | |
| Date of Birth: | 09/05/1979 |
| Race: | White |
| Sex: | Female |
| Height: | |
| Build: | |

Event Age: 31          Est. Age: 31 - 31

### *Personal Description*

| Category | Description | Related Offense | Comments |
|---|---|---|---|
| Employment Status | Employed | | |

## Other

| | |
|---|---|
| Role / Role #: | OT003 |
| Name: | |
| Residence: | 2626 7 ST NE<br>Minneapolis, MN 55418 |
| Telephone: | |
| Date of Birth: | 06/12/1972 |
| Race: | White |
| Sex: | Female |
| Height: | |
| Build: | |

Event Age: 38          Est. Age: 38 - 38

## Other

| | |
|---|---|
| Role / Role #: | OT004 |
| Name: | |
| Residence: | 2626 7 ST NE<br>Minneapolis, MN 55418 |
| Telephone: | |
| Date of Birth: | 06/12/1972 |
| Race: | White |
| Sex: | Female |
| Height: | |
| Build: | |

Event Age: 38          Est. Age: 38 - 38

## Other

| | |
|---|---|
| Role / Role #: | OT005 |
| Name: | Stack, Andrew |
| Residence: | 701 Park AV S<br>Minneapolis, MN |
| Telephone: | O:612-873-3887 |
| Date of Birth: | |
| Race: | |
| Sex: | |
| Height: | |

Event Age: 0          Est. Age: 0

Exhibit B

MPD CAPRS Case Report With Supplements - MP-11-155282

Build:

**_Employment Information_**

| Employer/School | Address | Telephone | Occupation |
|---|---|---|---|
| Home | | | Security |
| Availability: | | | |

**_Personal Description_**

| Category | Description | Related Offense | Comments |
|---|---|---|---|
| Employment Status | Employed | | |

## Other

| | | | |
|---|---|---|---|
| Role / Role #: | OT006 | | |
| Name: | Setter, Dawn | | |
| Residence: | 701 Park AV S | | |
| | Minneapolis, MN | | |
| Telephone: | O:612-873-3132 | Event Age: 0 | Est. Age: 0 |
| Date of Birth: | | | |
| Race: | | | |
| Sex: | | | |
| Height: | | | |
| Build: | | | |

**_Employment Information_**

| Employer/School | Address | Telephone | Occupation |
|---|---|---|---|
| Home | | | Nurse |
| Availability: | | | |

**_Personal Description_**

| Category | Description | Related Offense | Comments |
|---|---|---|---|
| Employment Status | Employed | | |

## Other

| | | | |
|---|---|---|---|
| Role / Role #: | OT007 | | |
| Name: | | | |
| Residence: | 2619 7 ST NE | | |
| | Minneapolis, MN | | |
| Telephone: | | | |
| Date of Birth: | 07/26/1956 | Event Age: 54 | Est. Age: 54 - 54 |
| Race: | White | | |
| Sex: | Male | | |
| Height: | | | |
| Build: | | | |

## Relationships

| Subject | | Relationship Type | Object | |
|---|---|---|---|---|
| OT001 | Carlson, Brad | | OT002 | |
| OT001 | Carlson, Brad | | OT004 | |
| OT007 | | | OT001 | Carlson, Brad |
| OT003 | | | OT004 | |

Exhibit B

MPD CAPRS Case Report With Supplements - MP-11-155282                                    Page 6 of 14

**Supplement number:  1     CCN: MP-11-155282     Author:**          000863 - David Burbank

Supplement of Sgt D.Burbank #000863 on 06/02/2011 00:14

TYPED BY EA, CCN 11-155282

On 06/01/11, I was working squad 206 as a shift supervisor, when I received a call from Officer TICHICH regarding a use of force incident that occurred on a Crisis candidate ID'd as Other #1/CARLSON(OT1). Officer TICHICH that they had to use a take down move on CARLSON in the sally port area leading into the Crisis Unit of HCMC. Officer TICHICH advised me that CARLSON may have injured his left arm. I advised Sgt. HEIL of the situation, and him and I drove down to HCMC together and met with Officers TICHICH and COLLINS. Prior to responding to HCMC, I read the remarks in the call and was aware that they were dealing with an EDP. Sgt. HEIL also advised me that he had also spoken to Officer TICHICH regarding the events that had taken place with this call.

While en route to HCMC, I was contacted OT6/SETTER, who is an RN in the ER Dept. of HCMC. She advised me that officers had brought in a party, and had to use a take down move on this person, and that he may need medical treatment.

We then met with Officers TICHICH and COLLINS outside of the hospital, and they explained that they had to use a take down move on OT1/CARLSON, and that he was handcuffed when this occurred. They advised that CARLSON was acting in a aggressive manner while they were escorting CARLSON into the sally port area. A take down maneuver was used on CARLSON, and he may have injured his left arm during the process.

Sgt. HEIL and I then met with OT5/STACK, who is a security officer for HCMC. STACK directed officers to the lower level of HCMC, which houses a security office. STACK showed us the video involving OT1/CARLSON being brought into HCMC. We then viewed the video with STACK, and he also downloaded the video onto a DVD.

Due to the circumstance involving the use of force, we contacted Lt. JENSEN, who notified Internal Affairs, per Dept. policy. I also contacted Lt. HEIMERL, who was Car 9 during this incident.

We then drove to Transcription and viewed the downloaded video with Lt. JENSEN and Officers COLLINS and TICHICH. After viewing the video, Sgt. HEIL and I went to HCMC and interviewed witness #1/LISSIMORE, who was present when OT1/CARLSON was brought into HCMC.

I spoke with OT5/STACK prior to responding to HCMC, and gave him a description of LISSIMORE, whom he ID'd by name. I advised him that we needed to return to the hospital and do an interview with her. Once we arrived at the hospital we were directed to LISSIMORE's location and went to a back interview room and conducted an interview. We introduced ourselves as Mpls Police Sgt.s, and that we were supervisors of the officers involved in this incident.

LISSIMORE stated she is an RN for HCMC, and she works in the Crisis Unit (APS). She stated that she buzzed the officers in and observed that the patient, OT1/CARLSON, was wearing shorts, and "bucking" officers. By this we believe she meant that CARLSON was pulling away from officers in an aggressive manner. She then observed CARLSON go down on his left arm. She also heard CARLSON yell at the officers "You're hurting me, why are you using pressure points on me?" She stated the shorter officer (COLLINS) grabbed CARLSON from behind and held his left arm. At this point LISSIMORE advised that she tried talking to CARLSON, but he wouldn't acknowledge her. She stated she heard the officers telling CARLSON to calm down and listen to the nurse several times, but CARLSON continued to be belligerent. LISSIMORE stated that the officers appeared to be preventing CARLSON from being combative, resistive, and wild.

A short time later security arrived and the officers backed off and allowed security to take control of CARLSON. She heard security direct CARLSON to get on his knees, and that CARLSON then was assisted up by security and escorted to the ED (Emergency Dept.). LISSIMORE advised that while CARLSON was being escorted by security and herself, he continued to be uncooperative, combative, and yelling at them.

Exhibit B

MPD CAPRS Case Report With Supplements - MP-11-155282                    Page 7 of 14

I took custody of the video and inventoried it.
:END of Supplement 1

Exhibit B

MPD CAPRS Case Report With Supplements - MP-11-155282                     Page 8 of 14

---

Supplement number:  2     CCN: MP-11-155282    Author:            002879 - Eric Heil

---

Supplement of Sgt E.Heil #002879 on 06/02/2011 00:19

TYPED BY EA, CCN 11-155282

I was contacted by Officer TICHICH on his cell phone requesting my assistance at the above address. Officers were looking for advice on what to do with the Crisis candidate that they had in their squad. Officers informed me that they were not sure if they should be charging him with making threats to neighbors or simply take him down to the hospital for an evaluation.

I reviewed remarks on the call and noted that it appeared the party had a mental health issued and should be taken to Crisis. I advised officers to transport him and sign a hold.

Later, I was contacted by officers at HCMC, who stated that they needed my assistance. Sgt. BURBANK and I then drove to HCMC. See Sgt. BURBANK's statement for details. Officers later completed a Use of Force Report, and contacted Car 9 and Internal Affairs, per Dept. policy.

**END of Supplement 2**

Exhibit B

MPD CAPRS Case Report With Supplements - MP-11-155282

---

**Supplement number:** 3     **CCN:** MP-11-155282     **Author:**          001259 - Aaron Collins

---

Supplement of Off A.Collins #001259 on 06/02/2011 01:21

TYPED BY SC, CCN 11-155282

On 6/1/11 I was working squad 264 with my partner, Officer TICHICH. At approx 1957 hours we were dispatched to 2625 7th St NE on the report of a check the welfare. Remarks in the call stated: 1/1/2011 19:37:11 SYS Response [Appended, 19:57:11] Possible E911 Wireless Phase 2 update
6/1/2011 19:37:13 111314 Response [Appended, 19:57:11] OTS OF ABV IN FRT / 2 W/M 'S INV IN A VERBAL ARGUMENT .
6/1/2011 19:38:40 111314 Response [Appended, 19:57:11] # 1 SUSP IS A 30 YO W/M WRG WHI TSHIRT # 2 SUSP IS A 50 YO W/M WRG NO SHIRT / BLK SHORTS , BOTH SUSPS ARE NBRS. CNL CALL-BOTH PARTIES HAVE RET TO THEIR HSE'S .
6/1/2011 19:39:43 CT065649 Response [Appended, 19:57:11]          FROM     ST NE SAYS NBR POSS NAMED BRAD—WM—NO SHIRT— SHORTS—IS OTS INFRT THREATENING HIM—CLR THINKS HE MAY BE BIPOLAR AND OFF HIS MEDS—SUSP LIVES AT 2625 7 ST NE—CB 612-789-7081
6/1/2011 19:43:35 CT111084 Response OF CLR WHO CLAIMS NBR TONY BROWN AT 2626 7 ST NE IS A C.I.A. OPERATIVE WHO IS SELLING DRUGS "AND THAT'S ALL I HAVE TO SAY!"
6/1/2011 22:22:26 061767 Response COMBINED WITH DISP CALL...1937 HRS...2633 7 ST NE...CN 155269.

We arrived at approx 1959 hours and parked just south of the address. I could see that it was a single family dwelling with a fenced in yard. Due to the remarks in the call, believing that the male at the address may be off his medications and had already threatened a neighbor, Officer TICHICH and I decided that it would be best to have the male, later ID'd as Other 1/CARLSON, come out of the house instead of us going to the door. I saw Officer TICHICH reaching for his portable radio to have dispatch attempt a call back to have Other 1/CARLSON come outside when I could see Other 1/CARLSON standing at his front door.

Other 1/CARLSON yelled, "What do you guys want?" We told him, "Why don't you come outside and speak with us?" Other 1/CARLSON stated that we should come inside the house. Due to the prior remarks, we decided that Other 1/CARLSON should come outside and speak with us. After a few moments of telling Other 1/CARLSON to come outside, he flung open the door and walked at a very fast pace down his sidewalk to the front gate of his fenced in yard.

Other 1/CARLSON was asked what was going on. He began pointing to his neighbor's house on the west side of the street, stating that they were "CIA operatives" selling drugs. When Other 1/CARLSON spoke, I could smell the odor of an alcoholic beverage coming from his breath. Other 1/CARLSON also appeared to be sweating profusely. When Other 1/CARLSON was asked why he thought his neighbors were CIA operatives, he would yell at officers, "Be quiet! It's my time to talk!"

I then asked Other 1/CARLSON if he was on any medication or had had anything to drink today. Other 1/CARLSON stated, "No, are you on any medication?" Other 1/CARLSON then began speaking about a house on the east side of the street, two houses north of his, that was the corporate hangout of the HELLS ANGELS sponsored by the CIA. He stated the Hells Angels house was not the motorcycle gang but the "Lawyer's Guild" of the Hells Angels.

Other 1/CARLSON then ran to the NW corner of his lawn, still in his yard, and started yelling to his neighbor, TONY. The first couple of times he was yelling for TONY, his voice sounded normal. The third and fourth time he yelled at TONY his voice sounded much deeper, louder and angrier. Other 1/CARLSON then ran back to his walkway in front of us. I asked him if he had ever been to HCMC to speak with a psychiatrist or if he was taking any medication. Other 1/CARLSON then yelled, "This is my time to talk! If you're not gonna listen to me, I'm done!" At that time, he turned around and started walking back up to his house.

Fearing for Other 1/CARLSON's safety and the safety of others in his neighborhood, we decided that we

Exhibit B

needed to further investigate Other 1/CARLSON's state of mind. We entered through the front gate of the fence as Other 1/CARLSON got to the threshold of his front door and opened it. I grabbed for Other 1/CARLSON's right arm while Officer TICHICH was on the other side. Other 1/CARLSON's right arm was holding onto the door handle and his arm was tensed. I then pulled on Other 1/CARLSON's right arm approx three times until he let go of the door handle. When I grabbed Other 1/CARLSON's right arm, I was standing at the same level as he was and could see that he is approx 60⁄4 tall, approx 250 lbs and while grabbing his arm, I could feel that his forearms were muscular. I was able to place his right hand behind his back and he was handcuffed by Officer TICHICH.

We then walked Other 1/CARLSON to the squad. While we were walking him, I asked if he had house keys so I could secure his home. Other 1/CARLSON stated, "You don't have fucking permission to go in my house!" I told him I just wanted to secure it if we had to take him with us. He then stated words to the effect of, "Good, because last time I was taken to HCMC the CIA and Hells Angels stole all of my stuff."

I then walked into Other 1/CARLSON's home to see if the set of keys was anywhere near the front door or if there were possibly medications bottles that would explain Other 1/CARLSON's behavior. I could not find either so I walked back out to the squad and asked him if he could tell me where his house keys were. Other 1/CARLSON stated that they were on a hook in his kitchen so I locked the front door from the inside and started walking out when I noticed a glass sitting on Other 1/CARLSON's computer desk, which is in the living room. There was condensation on the glass. I smelled the contents of the glass, which smelled like an alcoholic beverage. I then exited the back door and secured the house with Other 1/CARLSON's keys.

As I was walking around the house, I saw that Officer TICHICH was speaking with Other 1/CARLSON's neighbor,                     who lives one house south at 26    7th St NE, phone                     . I heard him state that he is afraid of Other 1/CARLSON. He then began stating that Other 1/CARLSON has lived there a long time, but 15 years ago he had moved to the address. He then asked if Other 1/CARLSON was drunk and said Other 1/CARLSON used to be a bad drunk, but he thought he had been sober for a while. He then began telling a story of how in the winter            started his snowblower and Other 1/CARLSON walked outside and asked him if he was just going to stand there. He asked Other 1/CARLSON what business it was of his, when Other 1/CARLSON ran through the alley, right to his back fence and got within inches of his face. He explained this by putting his index finger and thumb approx an inch apart up to his nose, as if to show that Other 1/CARLSON was very close. He stated that he has seen Other 1/CARLSON wearing camouflage, "creeping" through neighbors yards looking for CIA agents and drug dealers. Officer TICHICH continued to speak with him while I walked to the squad to speak with Other 1/CARLSON.

Right as I sat in the driver's seat, I asked Other 1/CARLSON what his name was. He stated something to the effect, "I'm not going to tell you anything. You work for them and you're a Satan fucker!" He then stated, "Why don't you take these cuffs off me and I'll fucking kill you! You're a puny little fuck, I should have fought you guys before you handcuffed me!"

From the remarks in the call, I checked the name in DVS and found Other 1/CARLSON. I asked Other 1/CARLSON if that was his name and he stated, "Why don't you ask the CIA?" Other 1/CARLSON kept asking why he was under arrest. I explained to him numerous times that he was not under arrest and we were worried about his safety. I tried to explain that to him approx ten times. Other 1/CARLSON would then tell me that he is going to sue me and take everything I have. Other 1/CARLSON then stated, "When I get out, come find me and I'll break your face!"

After listening to Other 1/CARLSON make physical threats to me for approx ten minutes, I just ignored him. He then started asking me if I was Satan. I told Other 1/CARLSON no, I was a police officer and I was there to help him. Other 1/CARLSON then said, "You're too busy getting fucked in the ass by Satan to help me!" At that time, I saw that Officer TICHICH was walking to the squad car so I exited to speak with him. I did this because I wanted to speak privately and not further upset Other 1/CARLSON.

I asked Officer TICHICH what the neighbors had told him. The neighbors had felt terrorized and felt like prisoners inside their homes due to Other 1/CARLSON's behavior. Those comments further made us believe that Other 1/CARLSON was a danger to himself and others and needed to be transported to HCMC for an

Exhibit B

evaluation.

We then began transporting Other 1/CARLSON. We pulled the squad car over just north of the intersection of 7th and Lowry Av NE to contact Sgt. HEIL to advise him of the situation. Officer TICHICH spoke with the sergeant while outside the squad so as to not further upset Other 1/CARLSON. During the transport of Other 1/CARLSON to HCMC, he seemed to have fixated on Officer TICHICH and most of his physical threats were directed toward him. At one point in time, Other 1/CARLSON again threatened me by stating that he would "beat the shit out of" me next time he saw me. Other 1/CARLSON then asked if we could drive him to the north side, unhandcuff him and fight him. He stated he would kick our asses. He then stated that if he won the fight, we would have to let him go but if he lost we could take him to jail. Other 1/CARLSON then asked if I played any sports. I did not reply to him. He then stated that he was a boxer and a wrestler. He then made comments about MMA fighter "BIG COUNTRY" and stated when he got out of the squad he was going to bash our faces in with elbows.

A short time later, we arrived at HCMC and parked by the front door of APS. Officer TICHICH opened the door for Other 1/CARLSON as I walked around the back of the car to help escort him inside. I could see that Other 1/CARLSON was staring only at Officer TICHICH and did not seem to be aware of his surroundings because he was so fixated. Other 1/CARLSON then got out of the squad and I took Other 1/CARLSON by the left bicep with my right hand. While we were walking to the front secured door of APS, Other 1/CARLSON aggressively turned toward Officer TICHICH numerous times. While he was aggressively turning, he yelled, "Stop manhandling me!" I told him calmly that we were not manhandling him. I could see that Other 1/CARLSON never took his eyes off of Officer TICHICH. While he was turning, I tried to hold onto his left bicep with my right hand, but he was so sweaty that it was hard due to his size and the fact that he was shirtless.

The front secure door opened and we began to walk through. Other 1/CARLSON more aggressively turned toward Officer TICHICH and yelled again, "Stop manhandling me!" I then noticed that inside of the secure sally port the hallway was very narrow. At that time, I felt Other 1/CARLSON begin to turn toward Officer TICHICH again. This time, his turning felt quicker and more powerful than the other times he had aggressively turned toward Officer TICHICH. I placed my right forearm through Other 1/CARLSON's left handcuffed arm, pivoted my right foot behind his left foot, took my left arm to his chest area and forced him to the ground while trying to control his fall with my right arm. I believed that Other 1/CARLSON needed to be controlled and the safest place for him to be was on the ground. I believed that HCMC security would be able to strap Other 1/CARLSON into a wheelchair or a gurney more easily if he was on the ground.

Very soon after Other 1/CARLSON was on the ground, an APS staff member, Witness 1, came into the sally port and I heard her call for HCMC security. At that time, I was holding onto Other 1/CARLSON's right hand with my left hand while I kept four fingers on the right side of Other 1/CARLSON's jaw, because he was making noises as if he was going to spit. I kept telling Other 1/CARLSON to relax until HCMC security arrived. I released Other 1/CARLSON's right hand and stood back as HCMC security took control of him. An HCMC staff member walked out to the area where we were standing filling out the 72 hour hold on Other 1/CARLSON and advised us that Other 1/CARLSON may have a separated shoulder or broken arm. We were also advised that Other 1/CARLSON had blown a .11 BAC on a PBT.

Officer TICHICH then contacted Sgt. BURBANK for the use of force.
**END of Supplement 3**

Exhibit B

MPD CAPRS Case Report With Supplements - MP-11-155282                    Page 12 of 14

| Supplement number: 4 | CCN: MP-11-155282 | Author: | 007235 - Thomas Tichich |

Supplement of Off T.Tichich #007235 on 06/02/2011 01:22
While working Squad 264 with my partner Officer COLLINS, we were dispatched to a Check Welfare at 2625
7th St Ne. The remarks of the call stated OF CLR WHO CLAIMS NBR TONY BROWN AT 2626 7 ST NE IS A
C.I.A. OPERATIVE WHO IS SELLING DRUGS "AND THAT'S ALL I HAVE TO SAY!"
6/1/2011 22:22:26 061767 Response COMBINED WITH DISP CALL..1937 HRS...2633 7 ST NE..CN 155269.

It should be noted that this call had been combined by dispatch with (11-155269) in which the caller from our
call had been arguing with neighbors and said to be drunk, bi-polar and threatening. This call had been
canceled by request of the that caller (OT4/T.        ) because both parties were in their respective houses.
Dispatch was requesting we check on the welfare of this caller (OT1) because of the seemingly irrational
comments he made to them described in the remarks of the call above.

Officers arrived at 2625 7th St Ne and decided to have OT1 come outside to speak with officers given the
remarks of call. OT1 then came to the front door and yelled "What do you want?" I advised OT1 to come
outside and speak with us and that he had called us. OT1 then quickly opened his door and moved quickly
towards us and stopped at this front gate. I noticed that OT1 appeared intoxicated, as indicated by his eyes
being bloodshot and watery. I then asked OT1 what we could do for him and he began to talk about his
neighbor being a CIA Operative and selling drugs. OT1's continued to ramble about Hells Angels in the
neighborhood. OT1 appeared irrational and his voice would fluctuate at times yelling his neighbor's name
"Tony Brown" OT1 appeared aggressive and attempted to control the conversation by stating in a loud voice
"I'm talking here, its my time to talk"

Being concerned that OT1 was a danger to himself and others based on our limited conversation with him and
that he was possibly in a mental health crisis the decision was made to place a 72 hour hold on OT1 and take
him to HCMC CIC. As I entered the front gate of the residence, OT1 attempted to go back inside his house and
I advised him to stop. I then gained control of OT1 by grabbing him and placed handcuffs on him. OT1 was the
escorted to the rear of our squad car. My partner secured his residence and I was summoned by a male who
was speaking to me from the house directly to the south of OT1's (        7th St Ne). OT  stated "don't look
at me, that guy is crazy" I asked OT  for clarification of his statement and he repeated what he had said. I was
assisting my partner in securing the residence at this time because the front door wouldn't lock with the key we
had. OT  stated through this window "lock the door from the inside and go out the back". As we were in the
rear of the residence OT7 went on his back        and began to explain the neighborhood. He told me that OT1 is "crazy"
and is a "bully". He told me that OT1 terrorizes the neighborhood. He told me that he feels like a prisoner in his
own home due to OT1's aggressive actions. He told me of an incident where OT yelled at        because he was
using his snowblower. He said        told OT1 to mind his business and the next thing he knew OT1 was standing
in front of him. OT1 then told him " I'm not gonna kick your ass because you're my neighbor".

I then noticed the neighbors across the street were outside. Being aware the they were
         regarding OT1 I went to speak with them. I spoke with        who advised me that she is a mental health
professional who has been a neighbor of OT1 for approximately six years. She advised me that OT has severe
mental health issues and asked me if OT1 had been drinking. I advised her that he had been and she stated
she was concerned because she believed OT1 had quit drinking for a time and felt that the alcohol was
exacerbating his condition. She stated she heard OT1 yelling at her neighbors (        ) about a vehicle
in the front of her house. She stated that OT1 then told        he was "waging war" against       . She stated she
did nothing to provoke OT1's actions and took his statement as a threat and further stated that she is in fear of
OT1. I gave        a CCN and advised her on how to get a protection order.

I also spoke with        and        who were also outside. They advised me that OT1 is constantly confronting
them and calling their house and leaving messages. OT1 is accusing them of hacking and interfering with his
internet connection. They stated that they have been having problems with OT1 for approximately 13 years
and that they are in fear of OT1. I also gave them a CCN and advised them on protection orders.

We then transported OT1 to HCMC CIC. While enroute OT1 was accusing us of being "fat pussies" and
challenged us to a fight. He stated he was a "Child of God" and that we "sucked Satan's cock". OT1 refused to

Exhibit B

give us any personal information and continued to call us names during the transport. OT advised us that he was a boxer and a wrestler and that he was skilled in fighting.

Upon arrival at CIC, OT1 appeared to become more angry. I opened the door and asked him to step out of the car. OT1 just stared at me, eventually getting out of the squad on his own. I then placed my hand on his right arm and stated directed him to "walk this way" as I guided him with hand. OT1 aggressively spun in my direction and yelled at me "Don't manhandle me" as he stared at me. I advised OT1 to keep walking. OT1 took a few steps and spun aggressively towards me again and stopped walking, stating "Don't fuckin manhandle me". I again told OT1 to keep walking and he spun again towards me as we approached the outer vestibule door to CIC. OT1 just stared at me and appeared to be very angry. We proceeded through the outer door when OT1 once again spun towards me, forcing me to the corner of the CIC salleyport. OT1 again stared at me and yelled "stop manhandling me". I again told OT1 to keep walking while directing him with pressure from my hand to his right forearm. My partner then performed a takedown of on OT1 and we controlled him on the ground. I then advised W1 to summon security and I assisted in controlling OT1 by pinning his legs until security arrived. OT1 was yelling that "pressure points were being used against him. HCMC arrived and took control of OT1.

Staff then took OT1 into the back rooms and later returned stating that OT1 was injured and they were taking him to the ER. I then notified Sgt BURBANK.

**END of Supplement 4**

Exhibit B

**Supplement number: 5**      **CCN: MP-11-155282**   **Author:**          109079 - Alison Murray

Supplement of FVA-n A.Murray #109079 on 06/27/2011 15:52
Crime Lab Unit; Work Order Request

Per a work order received in the Crime Lab Unit on 6/27/11, on this date I removed one video disc, PI# 11-18293, Line 1, from the Property and Evidence Unit. At the request of Eric Meyer, Records Unit, I made one copy of the disc. The disc copy was labeled and Meyer was notified it was available for pickup in the Crime Lab Unit. The original disc was placed in its original jewel case, sealed with evidence tape, signed, and returned to the Property and Evidence Unit.

**END of Supplement 5**

End of report for case MP-11-155282. Print ID: b9c1e8a5-cbf5-4e65-bcb2-36434c606c3c

Exhibit B

[EXHIBIT 5]

Exhibit B



**Minneapolis**
*City of Lakes*

**Civilian**
**Police Review Authority**

350 South 5th Street - Room 239
Minneapolis MN 55415-1369
Office 612 673-5500
Fax 612 673-5510
TTY 612 673-2157

October 14, 2011

BRAD CARLSON
2625 7TH ST NE
MINNEAPOLIS MN 55418

Dear Mr. Carlson:

Please read over the enclosed Complaint Form, correct any errors, and sign it. Return the first copy to us in the self-addressed, postage-paid envelope, and retain the second copy for your records.

Respectfully,

Daniel Miller

Daniel Miller
Case Investigator

enc



City Information
and Services

www.ci.minneapolis.mn.us
Affirmative Action Employer

Exhibit B

REC'D OCT 2 5 2011

# COMPLAINT

| | | |
|---|---|---|
| CITY OF MINNEAPOLIS<br>CIVILIAN POLICE REVIEW AUTHORITY<br>350 South 5th Street, Room 239<br>MINNEAPOLIS, MN 55415-1369<br>(612)673-5500 | CASE NUMBER | 11-3037 |
| | DATE REPORTED<br>08/23/11 | TIME REPORTED<br>13:05 |

| Type of Incident | | | | | Code | Primary |
|---|---|---|---|---|---|---|
| Excessive Force | | | | | 1 | 1 |

| Location Where Occurred | Pct. | Ward | Date Occurred | Day of Week | Time Occurred |
|---|---|---|---|---|---|
| 2625 7th Street NE | 2 | 1 | 6/1/11 | WED | 19:40 |

| Code | Name | | Age | DOB | Gender | Race |
|---|---|---|---|---|---|---|
| CV | **Brad Carlson** | | 53 | 5/19/58 | M | W |

| Address | City/State/Zip | Home Phone | Business Phone |
|---|---|---|---|
| 2625 7th Street NE | Minneapolis, MN   55418 | 612-235-4097 | |

| Charged Officer 1 – Name and Badge No. | | Race | Gender | Rank/Assignment | Off-Duty |
|---|---|---|---|---|---|
| Thomas Tichich | 7235 | W | M | Officer/Pct 2 | ☐ |

| Charged Officer 2 – Name and Badge No. | | Race | Gender | Rank/Assignment | Off-Duty |
|---|---|---|---|---|---|
| Aaron Collins | 1259 | W | M | Officer/Pct 2 | ☐ |

**Allegations**

Complainant alleges that Officers Thomas Tichich and Aaron Collins used excessive force against Complainant when the officers took the handcuffed Complainant to the floor, breaking his left arm.

The Complainant alleges that he was not posing a threat to the officers or resisting the officers when the officers took him to floor.

I hereby certify that to the best of my knowledge, and under penalty of perjury, the statements made herein are true.

| | |
|---|---|
| _Brad Carlson_ | _10-16-11_ |
| Complainant's Signature | Date |
| _Daniel Miller_ | _10-14-11_ |
| Investigator's Signature | Date |

Exhibit B



**Minneapolis**
*City of Lakes*

**Civilian**
**Police Review Authority**

350 South 5th Street - Room 239
Minneapolis MN 55415-1369
Office  612 673-5500
Fax  612 673-5510
TTY  612 673-2157

October 28, 2011

BRAD CARLSON
2625 7TH ST NE
MINNEAPOLIS MN 55418

Dear Mr. Carlson:

Thank you for returning to us your signed complaint.  A copy of our Notice of Complaint is enclosed.  This is also sent to the officers involved and to the Police Department. We will now begin our process of reviewing the allegations in your complaint, and we will inform you of the status of our review in accordance with our rules.

The investigator assigned to your complaint is Stephen McKean.  His direct telephone number is **612-673-5505.**

If you have a change of address or telephone number, please notify Investigator McKean.

Yours truly,

*Samuel L Reid II*

Samuel L. Reid II
Assistant Director
Minneapolis Department of Civil Rights

SLR:sp

enc

311
*Call*
City Information
and Services

www.ci.minneapolis.mn.us
Affirmative Action Employer

Exhibit B

**NOTICE OF COMPLAINT**
Civilian Police Review Authority
350 South 5th Street, Room 239
Minneapolis, Minnesota  55415
612-673-5500

**File:   11-3037**
**Date:  October 28, 2011**

Officer Thomas Tichich (Badge #7235) and Officer Aaron Collins (Badge #1259):

Notice is hereby given that our office has received a signed complaint alleging the following acts, which may constitute misconduct under Minneapolis Code of Ordinances Title 9, Chapter 172.20:

**EXCESSIVE FORCE**

Complainant alleges that Officers Thomas Tichich and Aaron Collins used excessive force against Complainant when the officers took the handcuffed Complainant to the floor, breaking his left arm.

The Complainant alleges that he was not posing a threat to the officers or resisting the officers when the officers took him to floor.

This incident occurred on June 1, 2011 at approximately 19:40 at the location of 2625 7th Street NE.

Copies of this Notice will be forwarded to the Deputy Chief of Police for your assignment area and the Internal Affairs Unit.

Respectfully,

*Samuel L Reid II*

Samuel L. Reid II
Assistant Director
Minneapolis Department of Civil Rights

cc: Deputy Chief
    I.A.D.
    Complainant

noc 11-3037

Exhibit B



**Minneapolis**
*City of Lakes*

Civilian
Police Review Authority

350 South 5th Street - Room 239
Minneapolis MN 55415-1369
Office  612 673-5500
Fax  612 673-5510
TTY  612 673-2157

February 13, 2012

Brad Carlson
2625 7th Street NE
Minneapolis, MN 55418

RE: CRA File # 11-3037

Dear Mr. Carlson:

Enclosed are two copies of your statement given on February 13, 2012.  Please review and initial any corrections you wish to make on your statement.  Sign and return one copy of the statement in the enclosed stamped, self-addressed envelope.

Thank you for your cooperation and feel free to contact our office if you have any questions.

Sincerely,

Stephen J. McKean
Case Investigator

Enc: cms

Call 311
City Information
and Services

www.ci.minneapolis.mn.us
Affirmative Action Employer

Exhibit B



STATEMENT OF   **Brad Carlson**
PLACE:         Minneapolis Civilian Police Review Authority Offices
DATE:          February 13, 2012
TIME:          11:20 a.m.
5   CASE NO:       11-3037
INVESTIGATOR:  Stephen J. McKean

Q. Sir, could you state your full name, and spell your last name for me, please?
A. Brad Charles Carlson, C-A-R-L-S-O-N.

10
Q. What is your address?
A. 2625 7th Street Northeast, Minneapolis Minnesota, 55418.

Q. What is your phone number?
15   A. (612) 235-4097.

Q. What is your age and date of birth?
A. I am 53, born 5-19-58.

20   Q. On June 1st of 2011 at approximately 7:40 p.m. did you have contact with officers from the Minneapolis
police department?
A. Yes, I did.

Q. And did this occur at 2625 7th Street Northeast?
25   A. Correct.

Q. And is that your residence?
A. Correct.

30   Q. Prior to them arriving were you having a problem or conflict with a neighbor? Is that the reason why they
came out there?
A. Uh, yes, I-I... I have a neighbor at 2624 7th Street, right across the street from me, that would always park
on my walkway in the wintertime, making it difficult to snowblow. I also had reseeded and rototilled and
groomed my boulevard and it was irritating and I had tried to talk to them but he would always ignore me
35   and walk away. And this particular day he again parked in the walkway. And that would make people walk
on my grass and it was irritating. And when I tried to talk to him—I don't know his name, the police did not
interview him. They interviewed his significant other, I don't know if it's his wife. Maybe that's in the police
report. But she came at me aggressively and Tony Brown at 26th 7th Street Northeast came out and he
was aggressive toward me also. I... I walked—he was in the background and we had a discussion and I
40   said, "Tony, come down and talk."

I was barefoot, I have tender feet so I wasn't in any way threatening. Tony Brown later stated in the
restraining order he brought up against me along with his wife that I had walked to the bottom of his
driveway. Well, I never came close to him or his property, or I've never set foot on his property. But his
45   wife at that time was saying they had the police on the line. And Tony Brown had told me before during a
previous incident where the Minneapolis police arrested me that he had called the cops on me before.

So at that point, I went in and I called 911, and I made the statement that for many years of observation of
our neighborhood that he was a protected source and I believe I made the statement that he worked for
50   the CIA and is overseeing drug operations in our neighborhood. Well, the police came, and I walked out of
my house. I met them in the middle of a chain-link fence. I have a chain-link fence that opens and closes
my yard, and the fence stands probably, you know, six feet high because there's a three-foot wall. So I
wasn't being intimidating or anything else. We were having a decent conversation, and I saw Tony Brown over,
who's actually a house and a half away from me, still in the background and I went over and I said, I
55   yelled to him, "Tony, come down and talk." And well he didn't, and I proceeded to have a conversation with
the police officers about the drug activity that had proceeded in my neighborhood for years.

*Exhibit B*

And when I made the comment that I believed the CIA was involved, they came over to my gate and they
opened it up and I was trying to run back into my house. And without saying anything they both were
coming running and they tackled me at my front step. And they handcuffed me and I said, "Why am I
5   being arrested?" and they said, "You're not being arrested." And I repeated that, and they were saying,
"You're not being arrested." And I was placed in the squad car, handcuffed behind my back, and I said,
"You guys are going to make me lose my job," and they said, "Good, we want you to lose your job."

I believe it was the shorter of the two officers, I don't know if that was Tichich or Collins, to be honest, right
10  now. The, well, they took me—as they were driving, the larger officer, I think it's Tichich, all of a sudden
went out of the car and he was calling on his cellphone and I believe they were trying to determine what
they were going to do: arrest me or I don't know what the conversation was but admittedly I was upset that
I was being arrested for, I thought, no reason, and in a joking manner, you know, I mentioned, "Why don't
you guys," you know, "Take me to the north side and we'll duke it out and if I win you let me go." And it
15  was in a joking manner, and we were actually, both officers were laughing at different times.

And when we got to the Hennepin County Medical Center, I got out of the car and the officers—I believe
it's Tichich, the officer who had my right arm with his left hand—he was particularly grabbing my arm,
squeezing, putting his nails into it. There's a nerve in your arm that—I know about pressure points and I've
20  had some martial arts training and but they were pulling me back and forth. And at that time I became a
little concerned that they were, uh, that they were going to rough me up, the way they were pulling me
back and forth, the way he was--.

Q. Can you explain what you mean by "pulling" you "back and forth?"
25  A. Well my hands were tied or kept behind my back, and Tichich was putting his nails in and pulling me and
then Collins would pull me the other way and I was trying to go forward. I was worried they were going to
beat me up out on the street and he was really, I mean, squeezing. I do have a picture of it. It's not very
good because I was held at HCMC for... I don't know, six days. But then it was quite evident of a black
and blue marks on my right arm.
30
Q. When you're talking about them pulling you back and forth, was this from the time you got out of the
squad car at the hospital to the time you got into the sally port?
A. Correct. Yeah, they didn't do that—they didn't, you know, I went peacefully to the car and I did make a
comment that, while I was in the car, I said, "I should've fought you guys on my front steps" because they
35  never said anything. They just came in and tackled me. They didn't give a reason why, they just—so I
certainly wasn't going to fight them now. I mean, I was thinking legally that would have been the time
because I felt my civil rights were being violated. But when they got me out of the car, they were, I could
tell they were looking for me to do something by how hard he was grabbing my nerve in my arm and how
they were man-handling me.
40
And I told them repeatedly to quit man-handling me. And when we got into the HCMC sally port he was
really squeezing hard, and I turned and I said, "Quit man-handling me," and I was trying to go forward
because, well at that point I believe it was Collins who clotheslined me viciously and I was slammed on the
ground. Because of the way my arms were behind my back, and I believe Tichich still had—he actually
45  pulled down, too—my arm snapped, and it almost came out through the skin. And then I believe it was
Officer Collins, then, the shorter officer: when they had me on the ground—well they both, they put their
knees in my back and Collins was pushing his thumb on a nerve. There's a nerve behind your jaw on your
neck, and he was shoving on that, and at that point I was in shock, I was in pain. I didn't know my arm had
been severed. It basically had broken in two. [INAUDIBLE] like that, is what the x-rays have. I have the x-
50  rays.

But he was pushing so hard, a nurse came in and she's in the report. Renee Lizamore, and I told her, I
said, "They're using pressure points on me. They're using pressure points on me." And later, as we were
walking, when HCMC security came, they got me up—I mean, after I don't know how much time. They

Exhibit B

Carlson, Brad — CRA Complaint #11-3037

tried to say in the report I was "bucking." I wasn't doing anything, I was really afraid because at that point I'm handcuffed, I'm in pain, I don't know what's wrong with my arm but I was concerned they could do anything. And she made the statement, as I was being taken for medical care, "I saw them. They kicked that boy's ass." And I remember that clearly.

5
Q. Was that the first nurse that came in?
A. Yes, she is an African American nurse and she's in the video.

Q. So she's the first female nurse that came in, in the video, after the takedown?
10 A. Right, right. They said I was "bucking." I wasn't bucking; my feet were twitching and I was in shock, but I wasn't—I was in so much pain, he was pushing on the nerve on my neck and was creating a tremendous amount of pain, besides my broken arm which... which was totally uncalled for and to me it wasn't excessive force, it was assault.

15 Q. Now, there is some mention in the report, one of the officers states that he could smell alcohol. This was Officer Collins in his report, says that he could smell an odor of alcoholic beverage coming from your breath. Now had you had anything to drink that night?
A. I had a few drinks.

20 Q. Were you —[OVERLAPPING].
A. [OVERLAPPING].

Q. —prescribed medication?
A. I'll just say this: they said I had blown a .11 and that was incorrect.
25
Q. On the hospital report it was like a .08-something-or-other.
A. It was a .08. They... they weren't around and that was incorrect. I blew a .08.

Q. Okay, I saw that in the medical report.
30 A. Am I on any prescription medication? Yes. I take Zoloft and a half a tablet of Zyprexa.

Q. Okay. Is there any warning about alcoholic consumption while you're taking those medications at all?
A. Um... there are, to be—I don't know for certain on which bottles. Most medications say to be, they may have a warning. I'm not....
35
Q. Some say "May cause dizziness" or something?
A. Right, right. But I wasn't drunk. I was agitated for being arrested, or not being arrested, put on a 72-hour hold which turned out to be longer than that.

40 Q. Now, one of the questions I was going to ask you and we talked about it, that upon arrival what took place between the squad car and coming into that back entry door or the sally port door and you talked about that. You said they were —[OVERLAPPING].
A. [OVERLAPPING] back and forth, trying to incite me to do something.

45 Q. Okay.
A. And I was doing everything I could to go forward and to not—I wish there would've been a camera on the outside.

Q. Yeah, so do I. You can see you getting out of the squad car and then it's like, "Okay, what's happening now?"
50 A. Right.

Q. Now, the report talks about you turning and twisting and facing Officer Tichich on the way from the squad car into the facility. During that time, did you stop and turn and say anything to him or glare at him or

Exhibit B

anything like he says in his report?

A. He was creating so much pain in my arm and they were being so aggressive with me on the outside, pulling me back and forth, I told him several times to quit man-handling me but I would turn over my shoulder but I was trying at that point, I was concerned they were going to beat me up and I was moving
5     forward. They were pulling me

Q. Okay so you weren't pulling and tugging and trying to get away from them?

A. No. Well the thing is if you've ever had your hands handcuffed behind your back you're extremely vulnerable and I was concerned, in the video it shows I was moving forward. When we got into the sally
10    port that's when he really put his fingernails in, and it was painful, and it was painful enough, all I did was turn and said, "Quit," you know, "Quit squeezing my arm."

Q. So that's what you said to him in the video when you turned?

A. Yes, and then I turned and went forward and that's when Collins clotheslined me.
15

Q. Now, when you turned and started moving forward from the door, just before Collins took you down—.

A. Clotheslined me.

Q. Did you pull or tense up or do anything or say anything—.
20  A. No

Q. —that would indicate that you were going to be combative?

A. No. Like I said, the last thing in the world I'd want to be is combative at that point. I mean, I wasn't....

25  Q. Did you hesitate moving forward when, before you were taken down to the floor?

A. No, as the video clearly shows I was moving forward and I believe Collins was surprised that I didn't react harder, and clotheslined me while I was posing no threat whatsoever to him. And then after they have me down then he's, I'm posing no threat, they say in the report I was bucking. I wasn't bucking, my feet were twitching because my arm had just been severed. And also I had Collins cranking on a nerve in my neck
30  and Tichich also comes over and puts his knee in my back, and I believe in the report they say that he did that, pressing on my neck, because he thought I was going to spit on him. It's ridiculous. Another statement I'd like to say is that they said I was sweating profusely. That is ridiculous also. Toxicology reports of my health records show I had no illegal drugs in me.

35  Q. Now when they had you on the ground, did they make—did they say anything to you after they had taken you to the floor?

A. No. He was pressing so hard on my nerve in my neck, I was telling the nurse over and over, "They're using pressure points on me! They're using pressure points," 'cause it was very painful, besides my arm. I was in pain from my broken arm too but at that point I was feeling more pain from his thumb right behind
40  the jaw into the nerve of the neck—I was feeling more pain from that because he was putting tremendous force on me.

Q. Is there anything else that you'd like to add to your statement at this time, that we haven't covered?

A. I think we've covered a lot. I'll just say one thing: the hospital wasn't very kind to me. They had me on a
45  72-hour hold but they were of the opinion, you know, they asked me why was I fighting with police? I said, I wasn't. And that's the attitude they had. All they had to do was look at their own video which clearly shows that I wasn't. And the care I received, I was brought down to the second floor and I was getting Vicodin and I was in so much pain and they would not give me a stronger pain killer even though I suggested it. When I called into work they did not dial the phone for me. They gave me a phone and I had
50  to, with my broken arm, sit there and dial into work and I didn't have the exact number and it took ten minutes trying to find the right person. And it was just one of the most painful things that I've been through, was this.... And that's about it. You know, there's another—they gave me another breath test though, I'll state, where I blew a .037 and at that time, that one there would make my blood alcohol even less than the .08 that I did blow. I mean, you know, figuring out that, depending on body weight, you lose like a drink an

Exhibit B

Carlson, Brad — CRA Complaint #11-3037

hour.

Q. I just have a quick question: in the video, when the hospital security people came into the sally port and the officers backed away, did you tell them anything about your arm and the pain that you had there at all or did they give any consideration to that? Because it looked like they picked you up using both arms.

A. Yeah, I was in so much pain and in shock, I wasn't going to say anything. I just wanted the pain to stop and they got me up. At least I wasn't getting cranked on my neck anymore, and I didn't have a knee in the back or, and, the pain really—they didn't do me any favors by grabbing me by my broken arm. That's why I ended up where they said it might come out the skin. But I wasn't going to—I-I didn't say anything, I just wanted it all to stop.

Q. Alright. Did you tell the officers when they had you on the ground that your arm was hurting? Did you get a chance to tell them anything about that?

A. All I said, I was in so much pain from him cranking on my neck with his thumb, I said repeatedly, "They're using pressure points on me."

Q. You just wanted them to stop doing that?

A. Yeah, they were using pressure points on me and that's what I repeated, to the nurse. I said, "They're using pressure points on me," and that's what they did with my arm, too. With a pressure point, if you study any martial arts, you know, there's pressure points and they definitely, to me it was intention. They were trying to get me to illicit a reaction that they could then use excessive force.

Q. Okay. Anything else that you'd like to say?

A. Um... I will say this: I feel like I am being persecuted by the Minneapolis police department. I had an incident happen after that, that I'm trying to get information from... the, you know I lost my job even though I called in twice because they said I didn't call in for a three-day span. Well, I didn't get released, so I was out. I was surprised, I lost my job, and then to try to collect unemployment insurance, you know, the doctor stated that I was totally disabled and then later a few months went by, he stated I was totally disabled again and I told him, "I can't collect unemployment if I'm totally disabled. If I had even a severed arm I'd be partially—you know, I'd be able to do some kind of work."

Well he backdated it. I told him, "I need a limited ability," and they did that but he backdated it to 6/1 and then unemployment insurance was saying that I had been lying. And I got so frustrated that I said I should take a shotgun and blow my head off in front of your office. Not the wisest thing to say but I was feeling you know, everything was going against me. And this is after I won a, through the judge, through the you know, unemployment judge, my employer did not even put a call in, they did not even attend. I won that and they were still trying to deny me unemployment benefits. Well, evidently what she did is she called the police and the police called me and they said, "We heard what you said about insurance," and I said—'cause I asked, how'd you get my number.

And I said, "Well, I'm not suicidal and you know I'm pursuing a lawsuit against you. And any further contact I get from you I will consider harassment." And I hung up the phone and I unplugged the phone. Well, to my great surprise, they called the SWAT team in and I learned that they had cornered off the whole block, had called my parents—and I was actually playing on the computer and had music on and I didn't even hear 'til later, I heard they had a loudspeaker telling me to come out. And I told them, I said, "I'm not coming out unless you have a court order. You broke my arm last time." I was—they had the SWAT team, they had guys out there with guns. What they did is they threw concussion grenades into my house, two of my side windows I'd just painted, they had green, glass everywhere, blew out the lights on my garage. It appeared that they were having just a grand time, having fun, and I said, "I'm not coming out until you have a court order." And they would say, "We have a court order; you have to come out."

And I refused, and after several hours, I started calling the—because I called 911 when concussion grenades were blasting through my windows, and I said, "They're shooting at me." And if a person was mentally unstable, I believe that they were trying to provoke me into some type of firefight. I started calling

the news media and said, "I've got the SWAT team out here blowing in my windows." Finally they left, they left at approximately, I don't know... after a few hours, and I'm trying to find out the information from that and it's been over two weeks and I still haven't got it and now I suppose I have to call this Lieutenant Glampe from Internal Affairs. So I want to find out, because you know, that's... well they're trying to intimidate me. I will say another thing. Officer Collins and Tichich, a few days after I got out of the hospital, my arm was busted and so forth, they drove by my house, slowed down, had their windows open, and they waved at me as to rub it in my face like they had "got me". That's all I have to say.

Q. Okay. Has anyone from this office made any threats or promises to you to give this statement?
A. No.

Q. And once your statement has been transcribed, would you be willing to sign your statement?
A. Yes.

Q. It is 11:57 a.m. and we will conclude the interview.

Signature: _Brad Carlson_           Date: _2-14-12_

cms

Exhibit B

**MINNEAPOLIS CIVILIAN POLICE REVIEW AUTHORITY**
**350 SOUTH 5TH STREET, ROOM 239**
**MINNEAPOLIS, MN  55415**
**(612) 673-5500**

## NOTICE OF HEARING

Complaint No.      11-3037

Complainant:      Brad Carlson
Officer(s):          Thomas Tichich (Badge #7235)
                         Aaron Collins (Badge #1259)

To The Above Officer(s), Assistant Director Of Minneapolis Department of Civil Rights for the Minneapolis Civilian Police Review Authority, Complainant and Panel Members:

Please take Notice that a Hearing shall be held in this matter in Room 241 City Hall, 350 South 5th Street, Minneapolis, Minnesota at **7:00 p.m.** on **May 23, 2012**. Please enter City Hall through the 4th Street entrance.

At the hearing, the review authority manager shall present the investigatory findings of fact and recommendations to the panel. No person other than the review authority manager and the panel members shall be present during the presentation and discussion of the case. At the close of the case presentation, the complainant and the police officer, **or** their representatives, shall each be permitted ten (10) minutes to address the review authority, in the presence of each other, regarding the complaint.

**Please be prompt**. Failure to arrive at the start of the hearing will cause you to lose your opportunity to address the panel.

I have appointed the following members of the Authority to serve as the Hearing Panel in this matter:
Mary Pargo (Chair)
Patrick Kvidera
Vernon Wetternach

**ANY MEMBER NOT ASSIGNED TO A PANEL MAY SERVE AS ALTERNATE**

The hearing will be conducted in accordance with Title 9, Chapter 172 of the Minneapolis Code of Ordinance of the Minneapolis Civilian Police Review Authority, in particular with Section 172.100. For further information about the hearing process, please refer to the ordinance and administrative rules that can be found on the City's website: www.minneapolismn.gov/civilrights/cra/.

On Behalf of the Minneapolis Civilian Police Review Authority

*Vernon Wetternach*

Date:  May 7, 2012

Vernon Wetternach, Board Chair (acting)

Exhibit B



**Minneapolis**
*City of Lakes*

**Civilian**
**Police Review Authority**

350 South 5th Street - Room 239
Minneapolis MN 55415-1369
Office  612 673-5500
Fax   612 673-5510
TTY   612 673-2157

July 6, 2012

BRAD CARLSON
2625 7TH ST NE
MINNEAPOLIS MN 55418

RE:   **Complaint No. 11-3037**

Dear Mr. Carlson:

This letter is to inform you of the status of this complaint. Your CRA complaint is now closed and has been referred to the Chief of Police for further action. The Chief of Police shall provide the Authority and the Mayor with a written explanation of the reasons(s) for any additional action that is taken on the complaint.

If discipline is imposed on the officer, the Minneapolis Civilian Police Review Authority cannot advise you of this discipline until there is a final disposition in this matter. Final disposition occurs when the officer has exhausted all his/her appeal rights and the discipline is upheld.

If you have any questions, please feel free to contact me. Thank you for your attention to this matter.

Sincerely,

*Samuel L. Reid II*

Samuel L. Reid II
Assistant Director
Department of Civil Rights

**Call 311**
Minneapolis
City Information
and Services  SLR:cs

www.ci.minneapolis.mn.us
Affirmative Action Employer

Exhibit B

STATE OF MINNESOTA

COUNTY OF HENNEPIN



DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Case Type: Personal Injury; and
Other Civil

---

Brad Charles Carlson,

Court File No.: _____

Judge: _____

Plaintiff,

**NOTICE AND ACKNOWLEDGMENT OF
SERVICE BY MAIL NOTICE**

vs.

**JURY TRIAL DEMANDED**

**Thomas Tichich**, individually, and in his
official capacity as a City of Minneapolis
Police Officer;
**Aaron Collins**, individually and in his official
capacity as a City of Minneapolis Police
Officer; and
**City of Minneapolis**,

Defendants.

---

## TO: THE ABOVE NAMED DEFENDANTS

The enclosed Summons and Complaint are served pursuant to Rule 4.05 of the Minnesota
Rules of Civil Procedure.

You must complete the acknowledgment part of this form and return one copy of the
completed form to the sender within 20 days.

Signing this Acknowledgment of Receipt is only an admission that you have received the
summons and complaint, and does not waive any other defenses.

You must sign and date the acknowledgment. If you are served on behalf of a corporation,
unincorporated association (including a partnership), or other entity, you must indicate under
your signature your relationship to that entity. If you are served on behalf of another person and
you are authorized to receive process, you must indicate under your signature your authority.

1

Exhibit B

If you do not complete and return the form to the sender within 20 days, you (or the party on whose behalf you are being served) may be required to pay any expenses incurred in having to serve a Summons and Complaint in any other manner permitted by law, e.g. personal server by using a professional process server..

If you do complete and return this form, you (or the party on whose behalf you are being served) must Answer the Complaint within 20 days. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

I declare, under penalty of perjury, that two (2) copies this Notice and Acknowledgment of Receipt of Summons and Complaint, along with true and correct copies of the Summons and Complaint were mailed to each of the above named Defendants at their last place of employment, the City of Minneapolis Police Department, on July 30, 2012 by U.S. Mail.

Dated: July **30**, 2012

James R. Behrenbrinker (MN#186739)
*Attorney at Law*
Suite 202 – Minneapolis Grain Exchange
400 South Fourth Street
Minneapolis, MN 55415-1413
Tel.: 612.294.2605 (voice)
Fax.: 612.294.2640
Cell: 612.419.8400
Jbehrenbrinker@comcast.net

and

Karin Ciano (MN # 0343109)
Karin Ciano Law PLLC
2915 Wayzata Boulevard
Minneapolis, MN 55405
Tel.: 612.367.7135
Fax.: 612.437.4440
Karin@karincianolaw.com

**Attorneys For Plaintiff**
**Brad Charles Carlson**

2

Exhibit B

## ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

I declare, under penalty of perjury, that I received a copy of the summons and of the complaint in the above-captioned matter on _____ day of _____, 2012.

Dated: _____, 2012

_____
*Print Name*


_____
*Signature*


_____
*Relationship to Entity/Authority to Receive Service of Process*

3

Exhibit B

## CERTIFICATE OF SERVICE

I certify that on July 30, 2012, I caused the following documents to be served -

**(1) SUMMONS;**

**(2) COMPLAINT; and**

**(3) Two (2) copies of NOTICE AND ACKNOWLEDGMENT OF SERVICE BY MAIL**

ON:

(1) **The City of Minneapolis**
Mayor R.T. Rybak
Office of the Mayor
350 South 5th St., Room 331
Minneapolis, MN 55415.

(2) **Officer Thomas Tichich;**
Minneapolis Police Department
Second Precinct
1911 Central Avenue N.E. ☐
Minneapolis, MN 55418

*and*

(3) **Officer Aaron Collins.**
Minneapolis Police Department
Second Precinct
1911 Central Avenue N.E. ☐
Minneapolis, MN 55418

by enclosing true and correct copies in a sealed envelope and depositing it in the United States Certified Mail at Minneapolis, Minnesota, postage prepaid.

James R. Behrenbrinker (MN # 186739)

Exhibit B